IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RONALD J. DALTON,

    Plaintiff,

  vs.                                                                 1:16-cv-00273-LF

NANCY A. BERRYHILL,[1] Acting Commissioner
of the Social Security Administration,

    Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER comes before the Court on plaintiff Ronald J. Dalton's Motion to Remand or Reverse and Brief in Support of Motion to Remand, filed January 1, 2017, and fully briefed on May 4, 2017. Docs. 20, 21, 25, 28. The parties have consented to my entering a final judgment in this case. Docs. 6, 9, 10. Having meticulously reviewed the entire record and being fully advised in the premises, I find that the Administrative Law Judge ("ALJ") failed to apply the correct legal standards in weighing the opinions of two examining medical sources. I therefore GRANT Mr. Dalton's motion and remand this case to the Commissioner for proceedings consistent with this opinion.

    **I.    Standard of Review**

The standard of review in a Social Security appeal is whether the Commissioner's final decision[2] is supported by substantial evidence and whether the correct legal standards were

---

[1] Nancy A. Berryhill, the new Acting Commissioner of Social Security, is automatically substituted for her predecessor, Acting Commissioner Carolyn W. Colvin, as the defendant in this suit. FED. R. CIV. P. 25(d).

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, as it is in this case.

applied. *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). However, "'[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

**II.     Applicable Law and Sequential Evaluation Process**

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

### III.   Background and Procedural History

Mr. Dalton was born on April 23, 1971. AR[4] 26, 107. His mother committed suicide when he was nine. AR 1385. By the ninth grade, Mr. Dalton got in trouble because he was doing a lot of drugs and was "locked up in a mental ward," remaining in the state's custody until he turned eighteen. AR 1385–86. Mr. Dalton was never able to obtain his GED, and has worked different jobs as a way of educating himself. AR 1380, 1386. His past relevant work includes

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

[4] Documents 14–1 through 14–19 comprise the sealed administrative record ("AR"). When citing to the record, the Court cites to the AR's internal pagination rather than the CM/ECF document number and page.

working as a cook's helper, a dishwasher, in construction and labor, and as a cashier at a convenience store.  AR 1391–92.  At the time of the hearing, Mr. Dalton was married and living with his wife in an RV in Moriarty, New Mexico.  AR 1379, 1383–84.

Mr. Dalton worked until March 1, 2013, when he was struck by an automobile while he was walking or riding his bike through an intersection, which ultimately resulted in a total right knee replacement.  AR 303, 1375–76.  He currently makes money by panhandling and occasionally chopping weeds.  AR 1383–84. Mr.  Dalton testified that he is unable to work because he is too honest during interviews, and explains to potential employers that he does not "want to be pushed to work too hard" and reinjure his knee.  AR 1379.  When asked why he could not do work if he were permitted to sit all day, Mr. Dalton responded that such jobs are not available in Moriarty, where he is currently living, but that he "would have no problem trying to learn that kind of stuff."  AR 1379.  Mr. Dalton testified that he wanted to go to school to get his diploma "in something," although he didn't know what.  *Id*.

Mr. Dalton filed a Title II application for disability insurance benefits and a Title XVI application for supplemental income benefits on April 5, 2013, alleging disability since March 1, 2013, due to "leg injury resulting from being struck by car on bicycle, hip problems, [and] back problems."  AR 26, 107, 110, 119, 1360–65.  Mr. Dalton's application for benefits was denied initially and upon reconsideration, and he requested a hearing before an ALJ.  AR 26–51, 54–64, 73.  On August 4, 2015, ALJ Deborah Rose conducted a hearing, at which Mr. Dalton and Mary Diane Weber, a vocational expert, testified.  AR 1366–97.  The ALJ issued her unfavorable decision on December 7, 2015.  AR 13–23.

At step one, the ALJ found that Mr. Dalton had not engaged in substantial gainful activity since his alleged onset date of March 1, 2013.  AR 15.  Because Mr. Dalton had not engaged in

4

substantial gainful activity for at least 12 months, the ALJ proceeded to step two. At step two, the ALJ found that Mr. Dalton suffered from the severe impairments of "degenerative joint disease, medial meniscus derangement, and torn ACL of right knee, now status post, total knee replacement (TKR), depression disorder, learning disability, attention deficit/hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), history of poly-substance dependence, reportedly in remission." *Id.* The ALJ found that Mr. Dalton had two nonsevere impairments: hypertension and a MRSA[5] infection. AR 15–16. At step three, the ALJ found that none of Mr. Dalton's impairments—alone or in combination—met or medically equaled a Listing. AR 16–17.

Because none of the impairments met a Listing, the ALJ moved on to step four. At step four, the ALJ found that:

> [C]laimant has the residual functional capacity to perform less than a full range of medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[.] He has the ability to lift/carry, push/pull 25-pounds frequently, 50-pounds occasionally, stand/walk six to 8 hours in an 8-hour day, and sit six to 8 hours per day. He can occasionally climb, kneel, crouch, and crawl, and only occasionally operate foot controls with the right lower extremity. He can understand and carry out simple instructions, can have superficial and incidental work-related interaction with coworkers and supervisors, but no public interaction required to complete job duties.

AR 17. Applying this RFC, the ALJ determined that Mr. Dalton is capable of performing his past relevant work as a cook's helper. AR 21. The ALJ alternatively found at step five that "[Mr. Dalton] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy[,]" such as cleaner II or laundry laborer. AR 22–23. Accordingly, the ALJ determined that Mr. Dalton was not disabled. AR 23. The Appeals

---

[5] "MRSA" stands for Methicillin-resistant Staphylococcus aureus. https://www.mayoclinic.org/diseases-conditions/mrsa/basics/definition/con-20024479 (last visited November 14, 2017). A MRSA "infection is caused by a type of staph bacteria that's become resistant to many of the antibiotics used to treat ordinary staph infections." *Id.*

Council denied Mr. Dalton's request for review on February 25, 2016. AR 5–7. On April 8, 2016, Mr. Dalton timely appealed the Commissioner's decision to this Court. Doc. 1.

### IV. Mr. Dalton's Claims

Mr. Dalton raises eleven arguments on appeal. He contends the ALJ erred by: (1) improperly assessing the burden of proof at step five; (2) making an improper mental medical assessment and RFC; (3) failing to apply the standards of 20 C.F.R. § 1527; (4) rejecting the opinions of Dr. Rajesh and his staff; (5) criticizing the use of GAF scores by various practitioners; (6) rejecting Dr. Krueger's assessment; (7) failing to conduct a drug abuse and alcohol analysis as required by SSR 13-2; (8) improperly assessing Mr. Dalton's credibility; (9) improperly finding a "history of polysubstance abuse" to be a severe impairment at step two; (10) improperly finding that Mr. Dalton is only mildly restricted in his social functioning because he can panhandle; and (11) that the ALJ's "Physical RFC on knee with no post[-]surgery opinion is insubstantial evidence." Doc. 20 at 1–2.

Because I remand based on the ALJ's failure to appropriately weigh the conclusions of Drs. Rajesh and Krueger, I do not address the other alleged errors, which "may be affected by the ALJ's treatment of this case on remand." *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

### V. Discussion

The ALJ recognized that Mr. Dalton has several severe mental impairments. AR 15. She concluded, however, that "medical records show the claimant's depressed and anxious symptoms are well controlled with medication and counseling." AR 19. The Court finds this statement to be unsupported by substantial evidence. More importantly, in reaching this conclusion the ALJ

erred in weighing the opinions of Drs. Rajesh and Krueger, both examining physicians, as explained below.

Mr. Dalton presented to Presbyterian Medical Services on June 19, 2013, for an Initial Behavioral Health Assessment. AR 285–89. He presented as agitated with some delusional and paranoid ideation, inappropriate affect and self-touching, poor hygiene and lower intelligence. AR 288. His speech was noted to be "somewhat rambling and tangential, at times incoherent," and his reporting was "inconsistent." AR 288. His insight was "poor." *Id.* He was diagnosed with psychosis, major depression, and anxiety disorder, and was assigned a Global Assessment of Functioning ("GAF")[6] score of 30. AR 289. Mr. Dalton returned six days later on June 25,

---

[6] As the Tenth Circuit summarized in *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012):

> The GAF is a 100–point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. . . . GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
>
> • 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
>
> • 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
>
> • 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
>
> • 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."

7

2013, and was seen by Dilip Rajesh, M.D. AR 274–77. Dr. Rajesh noted that Mr. Dalton's appearance was disheveled and reflective of poor hygiene, his affect was constricted, his mood was irritable, and that his intellect is below average. AR 276. However, Dr. Rajesh indicated that Mr. Dalton was oriented to person, place, time and situation, his memory was intact, and his reasoning, impulse control, judgment and insight were noted to be "fair." *Id.* Mr. Dalton was assessed with "ANXIETY STATE NOS [not otherwise specified]." *Id.* Dr. Rajesh assigned a GAF score of 40. AR 277.

---

- 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

- 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

- 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."

- 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."

- 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."

- 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."

- 0: "Inadequate information."

*Id.* (quoting American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000)).

Mr. Dalton returned for a follow-up with Dr. Rajesh on July 23, 2013.  AR 268.  At that time he was experiencing "compulsive thoughts or behaviors, feelings of guilt or worthlessness, poor concentration and indecisiveness."  *Id.*  In assessing Mr. Dalton's mental status, Dr. Rajesh noted that Mr. Dalton was not exhibiting signs of psychosis or mania, but his reasoning was poor.  AR 269.  Dr. Rajesh diagnosed an "unspecified episodic mood disorder" as well as unspecified drug and alcohol dependence and assigned a GAF of 40.  AR 269–70.  Dr. Rajesh prescribed Risperidone,[7] and advised Mr. Dalton to return for a follow-up in two weeks' time.  AR 270.  There are not medical records indicating that Mr. Dalton ever followed up.

The ALJ gave Dr. Rajesh's GAF score "little weight" (effectively rejecting it),[8] because it "appears to have factored in [Mr. Dalton's] allegations of pain and physical function loss into his opinion as to [his] ability to function in the workplace."  AR 20.  "However," the ALJ explained, "this is beyond the scope of Dr. Rajesh's expertise."  AR 20.  Additionally, the ALJ gave little weight to GAF scores in general, "as they are subjective measurements that vary depending on the source and their level of knowledge and skill."  AR 19.  The ALJ explained that "[t]he newest version of the Diagnostic and Statistical Manual (DSM-V) no longer uses these scores for this very reason."  AR 19.

Concerned about Mr. Dalton's mental functioning, *see, e.g.*, AR 1368–69, Mr. Dalton's attorney referred him to Robert Krueger, Ph.D., for a consultative examination which occurred on July 8, 2015.  AR 1316–23.  Dr. Krueger reviewed Mr. Dalton's medical records, performed a clinical interview with biopsychosocial history and mental status examination, and administered

---

[7] Risperidone is an antipsychotic medication used to treat schizophrenia and bipolar disorder in adults.  *See* https://www.drugs.com/risperidone.html (last visited November 14, 2017).

[8] *See Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) (equating "according little weight to" an opinion with "effectively rejecting" it); *Crowder v. Colvin*, 561 F. App'x 740, 742 (10th Cir. 2014) (citing *Chapo* for this proposition); *Ringgold v. Colvin*, 644 F. App'x 841, 844 (10th Cir. 2016) (same).

the reading portion for the Wide Range Achievement Test – Revised (WRAT-R), Wechsler Adult Intelligence Scale – IV (WAIS-IV) and a Beck Depression Inventory (BDI). AR 1316. Dr. Krueger noted at the outset that "this was a somewhat challenging evaluation" because Mr. Dalton was a poor historian when providing his psychosocial history, and was vague and rambling when talking about his personal history. AR 1316. Mr. Dalton did not meet the full criteria for having a major depressive disorder, and there was no clear evidence of hypomania or mania or bipolar disorder, and no evidence of a psychosis. AR 1318. Still, test results indicated that Mr. Dalton had significant impairment of most cognitive skills, and there was ongoing evidence of a learning disorder. AR 1318–19. Mr. Dalton scored a total of 23 on the BDI test, which, according to Dr. Krueger is a "moderately elevated score, which suggests that he is likely to have significant problems with depression now." AR 1319.

Utilizing the DSM-IV, Dr. Krueger diagnosed Mr. Dalton with Post-Traumatic Stress Disorder, Depressive Disorder NOS, Learning Disorder NOS, and ADHD. AR 1319. Dr. Krueger further opined that "[p]sychosocial stressors appear to be at least moderate, and include having chronic pain and other medical issues, loss of former activities and lack of income." AR 1319. Dr. Krueger assigned a GAF score of 40 to 45. AR 1319. In summarizing his conclusions Dr. Krueger found that:

> The results of the current evaluation indicate that Mr. Dalton has multiple impairments and does have significant functional impairment. Because of chronic pain and reported physical limitations, serious cognitive impairment, and ongoing emotional difficulties Mr. Dalton can be expected to have moderate impairment with understanding, remembering, and following simple work instructions and marked impairment with complex or detailed instructions. Because of these same factors he is likely to have marked impairment with maintaining pace and persistence in many work environments. In his current condition he can be expected to have marked impairment with adjusting to changes in work environment. Because of chronic and serious emotional difficulties Mr. Dalton can be expected to have marked impairment in many relationships with coworkers, supervisors, and the general public. He can be expected to have

10

moderate impairment with traveling to distant places alone. At the present time Mr. Dalton can be expected to have moderate and in some work environments marked impairment with being aware of and reacting appropriately to dangers. His impairments and [sic] of long-term duration and can be expected to persist for more than one year. Mr. Dalton appears to be marginally capable of managing his own financial benefits at this time.

AR 1320.

The ALJ gave "some but not controlling weight to Dr. Krueger's opinion because it appears that he factored in the claimant's allegations of pain and physical functional loss into his opinion as to the claimant's ability to function in the workplace, and this is beyond Dr. Krueger's area of expertise." AR 21. As Mr. Dalton points out, the ALJ "does not state what part of [Dr. Krueger's] opinion she adopted [or] what evidence she compared to his opinion." Doc. 21 at 12. Rather, the ALJ appears to have rejected Dr. Krueger's findings that Mr. Dalton is limited in a variety of areas or impermissibly adopted only those findings that supported a finding of nondisability. *See Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007) ("An ALJ is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.").[9]

---

[9] "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. [§§] 404.1545 and 416.945." SSR 96-8p, 1996 WL 374184, at *1. This means the ALJ must consider how the claimant's impairments affect his or her physical abilities, mental abilities, and other abilities. An ALJ must consider all of the following when assessing a claimant's mental abilities:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. §§ 404.1545(c), 416.945(c); *see also* SSR 96-8p, 1996 WL 374184, at *6 ("Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-

11

For example, whereas the ALJ found that Mr. Dalton "can understand and carry out simple instructions," AR 17, Dr. Krueger found moderate limitations in his ability to understand, remember and follow simple instructions. AR 1320. "[A] moderate impairment is not the same as no impairment at all." *Haga*, 482 F.3d at 1208. Rather, "[m]oderately limited means the evidence supports the conclusion that the individual's capacity to perform the activity is impaired." *Jaramillo v. Colvin*, 576 F. App'x 870, 875 (10th Cir. 2014) (citing POMS DI 24510.063 B.2[10]). Thus, the ALJ rejected Dr. Krueger's finding of a moderate level of impairment in this area. The same is true of Mr. Dalton's moderately impaired abilities to react to dangers in the workplace and to travel to distant places, both of which are absent from the ALJ's RFC.

The ALJ also ignored Dr. Krueger's notations of marked levels of impairment in maintaining concentration and pace in many work environments and in adjusting to changes in the work environment. A claimant's ability is "markedly limited" "when the evidence supports the conclusion that the individual cannot usefully perform or sustain the activity." POMS DI 24510.063 B.3. The ALJ, however, did not account for these findings in Mr. Dalton's RFC. Similarly, whereas the ALJ found that Mr. Dalton "can have superficial and incidental work-

---

related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."). In formulating the RFC, an ALJ must perform a function-by-function assessment of these work-related functions, considering all of the relevant evidence in the case record. SSR 96-8p, 1996 WL 374184, at*2. The Tenth Circuit has held that where a claimant is found to have more than mild mental limitations in work-related functions, the ALJ must "express those impairments 'in terms of work-related functions' or '[w]ork-related mental activities.'" *Jaramillo v. Colvin*, 576 F. App'x 870, 876 (10th Cir. 2004) (unpublished) (quoting SSR 96-8p, 1996 WL 374184, at *6).

[10] The Program Operations Manual System ("POMS") is "a set of policies issued by the Administration to be used in processing claims." *McNamar v. Apfel*, 172 F.3d 764, 766 (10th Cir. 1999). The Court "defer[s] to the POMS provisions unless [it] determine[s] they are 'arbitrary, capricious, or contrary to law.'" *Ramey v. Reinertson*, 268 F.3d 955, 964 n.2 (10th Cir. 2001) (quoting *McNamar*, 172 F.3d at 766).

related interaction with coworkers and supervisors, but no public interaction required to complete job duties," AR 17, Dr. Krueger found that "Mr. Dalton can be expected to have marked impairment in many relationships with coworkers, supervisors and the general public." AR 1320. Given that Dr. Krueger found a marked limitation in Mr. Dalton's ability to interact with coworkers, supervisors and the general public, it is unclear why the ALJ differentiated between these groups and found that Mr. Dalton could have "superficial and incidental" contact with coworkers and supervisors, but no contact with the public. In short, it appears that the ALJ actually rejected Dr. Krueger's opinion, despite stating that she was giving it "some" weight.

The question is whether the ALJ's rejection of Drs. Rajesh and Krueger's opinions conformed with the legal standards applicable to "examining medical source opinions." *See Ringgold v. Colvin*, 644 F. App'x 841, 843 (10th Cir. 2016) (unpublished) (citing *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012) and 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)). Such opinions "may be dismissed or discounted, of course, but that must be based on an evaluation of all of the factors set out in the regulations and the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* "The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all." *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). But the ALJ still is required to consider all of the medical opinions, explain the weight given to the opinions, and provide specific, legitimate reasons if he or she rejects an opinion. *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003); SSR 96-6p, 1996 WL 374180, at *1. The relevant factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency

between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (quoting *Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir.2001)). "[N]ot every factor for weighing opinion evidence will apply in every case." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting SSR 06-03p, 2006 WL 2329939, at *5). Thus, an "ALJ need not explicitly discuss all the factors if his decision is 'sufficiently specific to make clear to any subsequent reviewers the weight he gave to the medical opinion and the reasons for that weight.'" *Rivera v. Colvin*, 629 F. App'x 842, 844 (10th Cir. 2015) (unpublished) (quoting *Oldham*, 509 F.3d at 1258).

Here, the ALJ only provided two reasons for according little weight, and thereby effectively rejecting, Dr. Rajesh's opinion as to Mr. Dalton's GAF. The first—that the GAF score "appears to have factored in the claimant's allegations of pain and physical function loss into his opinion as to the claimant's ability to function in the workplace. . . . [which] is beyond the scope of Dr. Rajesh's expertise" (AR 20)—appears to be wholly speculative. *See* AR 268–89 (Dr. Rajesh's treatment notes from 6/19/2013 through 7/23/2013, which do not indicate what specific factors Dr. Rajesh considered in determining Mr. Dalton's GAF). However, "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Robinson*, 366 F.3d at 1082 (quoting *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)). Neither the ALJ nor the Commissioner point to any medical evidence that is contrary to Dr. Rajesh's opinion. As such, this reason is unsupported by substantial evidence.

The second reason that the ALJ rejected Dr. Rajesh's opinion is a critique of GAF scores

14

in general, which arguably touches upon the supportability of the opinion. *See* 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). As the ALJ rightly notes, the current Diagnostic and Statistical Manual has abandoned the use of GAF scores. *See* AR 19; Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 16 (5th ed. 2013). Nonetheless, medical providers continue to use GAF scores, as evidenced by this case. Moreover, while GAF scores may be subjective, the ALJ's rationale for discounting the score assigned by Dr. Rajesh—that the longitudinal medical record shows Mr. Dalton's mental impairments are well controlled with treatment and medication compliance—is unsupported by substantial evidence. *See* AR at 19. The ALJ did not point to a single medical record that shows that Mr. Dalton's mental impairments are well controlled, *see* AR 20, and I reject the Commissioner's *post-hoc* support for the ALJ's conclusion on appeal. *See* Doc. 25 at 5; *see also Haga*, 482 F.3d at 1207–08 ("[T]his court may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself.").

Likewise, the ALJ only provided one reason for discounting (or rejecting) Dr. Krueger's opinion: "it appears that he factored in the claimant's allegations of pain and physical functional loss into his opinion as to the claimant's ability to function in the workplace, and this is beyond Dr. Krueger's area of expertise." AR 21. Although Dr. Krueger's conclusion indicates that Mr. Dalton's impairments are due in part to "chronic pain and reported physical limitations," they also are premised on his "serious cognitive impairment, and ongoing emotional difficulties." AR 1320. While the ALJ certainly could discard any findings concerning Mr. Dalton's physical abilities, the ALJ provides no support for her claim that consideration of chronic physical pain is beyond the scope of mental health examination. AR 21.

Still, assuming for the sake of argument that the ALJ's reason was valid and can be construed as a comment concerning Dr. Krueger's specialty, she failed to address the other five regulatory factors when rejecting Dr. Krueger's opinion. While not every factor will apply in every case, the record must make clear that the ALJ at least *considered* all six factors. *See Oceguera v. Colvin*, 658 F. App'x 370, 374 (10th Cir. 2016); *Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) ("Although the ALJ's decision need not include an explicit discussion of each factor . . . the record must reflect that the ALJ considered every factor in the weight calculation.") (emphasis in original). Here, while the ALJ stated that she "considered opinion evidence in accordance with the [regulatory] requirements," she makes no further mention of the factors. AR 17. This Court cannot "simply presume" that the ALJ applied the correct legal standards, *Watkins*, 350 F.3d at 1301, especially given the deference the Tenth Circuit has recently paid examining sources. *See Kellams v. Berryhill*, — F. App'x —, 2017 WL 3432373, at *7 (10th Cir. Aug. 10, 2017) ("The ALJ erred in discounting Dr. Borja's opinion based on her single exam, yet according great weight to Dr. Fieger's opinion, which was based on a review of the then-incomplete medical record.").

The only question that remains is whether the ALJ's errors were harmless. *See, e.g.*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 (10th Cir. 2012). An ALJ's error in weighing a medical opinion is harmless where giving greater weight to the opinion would not help the claimant's case, where the doctor's findings are consistent with the RFC formulated by the ALJ, or where it conflicts with a contrary opinion by a more qualified healthcare professional. *See id.* at 1161–65. As explained above, giving greater weight to the doctors' opinions would have resulted in a more restrictive RFC in this case. Additionally, there are no contrary opinions from any treating or examining source. As such, the ALJ's errors are not harmless.

## VI. Conclusion

The ALJ failed to adequately apply the legal standards set forth in 20 C.F.R. §§ 404.1527(c) and 416.927(c) in rejecting the opinions of Drs. Rajesh and Krueger.

IT IS THEREFORE ORDERED that plaintiff Ronald J. Dalton's Motion to Remand or Reverse (Doc. 20) is GRANTED. The decision of the Commissioner is REVERSED and REMANDED for further proceedings consistent with this opinion.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent